STATE OF CONNECTICUT *v.* MATTHEW MACNEIL
(10570)

DUPONT, C. J., DALY and NORCOTT, Js.

Argued June 2—decision released August 11, 1992

*Thomas P. Cody* and *Bonnie R. Vairo,* special public defenders, with whom, on the brief, was *Sally S. King,* special public defender, for the appellant (defendant).

*Rita M. Shair,* assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *Timothy J. Liston,* senior assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant challenges the trial court's denial of his motion to suppress cocaine and drug related paraphernalia seized during a warrantless search of his sister's house. After the court denied the motion, the defendant entered a conditional plea of nolo contendere, pursuant to General Statutes § 54-94a,[1] to the charge of possession of cocaine with intent to sell in violation of General Statutes § 21a-277 (a).[2] He was sentenced to a term of fifteen years imprisonment, suspended after ten years, and five years probation.

The defendant claims that the trial court improperly denied the suppression motion because the police (1) entered his sister's house without her consent, (2) conducted an unconstitutional search of a shopping bag containing his clothes, and (3) improperly seized evidence pursuant to the plain view doctrine. We affirm the judgment of the trial court.

The trial court relied on the following facts. On the morning of July 30, 1989, state police received a report that someone was in a wooded area behind a house in

[1] General Statutes § 54-94a provides in pertinent part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

[2] General Statutes § 21a-277 (a) provides in pertinent part: "Any person who . . . possesses with the intent to sell or dispense . . . to another person any controlled substance which is a hallucinogenic substance other than marihuana . . . for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

Killingworth, calling out for help. Trooper William Logiodice investigated and learned that Andy Peoples, who lived in the residence, had given an individual he knew as Matt a ride to Haddam. Peoples said that during the ride Matt had stated that his "father would kill [him] if he saw [him] like this," and had asked to be driven to his sister's house.

Logiodice then discussed what he had learned with Troopers Thomas Murray and Joseph Delehanty. On the basis of this information and other factors known to Murray, he suspected that the person known as Matt was Matthew MacNeil, the defendant, whom he had known for about a year and who he suspected was a narcotics user. Thereafter, the three troopers went with Trooper David Brundage to an address in the Higganum section of Haddam, which they believed to be the residence of the defendant's sister, in order to investigate further.

When the troopers arrived, Murray knocked at the door and was met by the defendant's sister, Alanna Wheeler, an owner of the house. He told her there may be a problem with the defendant and asked to see him. Wheeler said she would check to see if he could do so and went back into the house while Murray waited at the door. While there, Wheeler's son came to the door and said that the defendant was lying on a couch inside. Wheeler then returned and led Murray into the living room, where the defendant was asleep on a couch, clad only in a tee shirt and underwear.

Shortly thereafter, when the defendant awoke, he began shaking. His arms and legs were thrashing about, and he looked sick, confused and frightened. Wheeler, who had never seen him in this condition before, agreed with Murray that an ambulance should be summoned. She then began discussing the defendant's clothes with Murray and handed him a shopping bag that contained

them. When Murray reached in and pulled out the defendant's pants, a large packet of cocaine fell to the floor. Murray seized the shopping bag, along with the cocaine, some plastic bags and a brown paper bag. Thereafter, he obtained Wheeler's written consent to search the rest of the house. Other drug related items were found, including a scale used in the preparation of illicit narcotics.

The defendant filed a motion to suppress in which he claimed that the warrantless search and seizure of his personal belongings violated his rights under the fourth and fourteenth amendments to the United States constitution, and article first, § 7, of our state constitution.[3] In its memorandum of decision, the trial court found that the troopers had entered the Wheeler house with the owner's consent, that no search of the shopping bag had occurred and that the subsequent search of the house had been conducted with the owner's consent. The defendant entered a plea of nolo contendere, conditioned on his right to take an appeal.[4]

## I

The defendant first claims that his suppression motion should have been granted because the police entered his sister's house without her consent. We disagree.

As a threshold matter, we must set forth the appropriate standards under which we review a trial court's denial of a suppression motion. The court's conclusions will not be disturbed " 'unless they are legally and logically inconsistent with the facts.' " *State* v. *Cofield,*

---

[3] Article first, § 7, of the Connecticut constitution and the fourth amendment to the United States constitution use the same words and are read to mean the same thing. *State* v. *Mariano,* 152 Conn. 85, 95, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965); *State* v. *Grillo,* 23 Conn. App. 50, 53 n.5, 578 A.2d 677 (1990).

[4] See footnote 1, supra.

220 Conn. 38, 44, 595 A.2d 1349 (1991). Its factual findings will be reversed only if they are clearly erroneous. *State* v. *Jones,* 193 Conn. 70, 79–80, 475 A.2d 1087 (1984); *State* v. *Zindros,* 189 Conn. 228, 244, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). This involves a two part procedure. First, where the court's legal conclusions are challenged, we must decide if they are legally and logically correct, and if they are supported by the facts set forth in the memorandum of decision. *State* v. *Zindros,* supra, 238. Second, if the factual basis of the court's decision is challenged, we must determine whether the facts in the memorandum are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. Id.

In our resolution of this matter, we remain ever mindful that "[o]ne of the most fundamental propositions of our criminal jurisprudence"; *State* v. *Harris,* 10 Conn. App. 217, 222, 522 A.2d 323 (1987); is that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* v. *New York,* 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin,* 190 Conn. 440, 446, 461 A.2d 963 (1983). A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with authority to do so has freely consented. *State* v. *Reagan,* 209 Conn. 1, 7, 546 A.2d 839 (1988). It is the state's burden to prove that the consent was freely and voluntarily given, and that the person who purported to consent had the authority to do so. *Bumper* v. *North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); *State* v. *Reagan,* supra. Such consent may not be established by mere acquiescence to police authority. *State* v. *Jones,* supra, 79.

Moreover, whether consent was freely and voluntarily given, or was the product of coercion, express or implied, is " 'a question of fact to be determined from the totality of all the circumstances.' " *State* v. *Reagan,* supra, 7–8, quoting *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). It is to be decided by the trial court on the basis of the evidence before it that it finds credible, along with the reasonable inferences that may be drawn from that evidence. *State* v. *Reagan,* supra, 8; *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978). The ultimate question "is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." *State* v. *Cobbs,* 7 Conn. App. 656, 659, 510 A.2d 213 (1986).

In this case, the trial court credited the testimony of Murray in finding that Wheeler freely and voluntarily allowed the police into the residence, and that she was not coerced and did not acquiesce to Murray's authority as a state trooper. Although the defendant argues that the testimony of Wheeler and Michael MacNeil, the defendant's brother, supports his claim that no consent was given and that Wheeler felt intimidated by Murray, we are mindful, as we must be, that where there is conflicting testimony, it is uniquely the function of the trier of facts to weigh the evidence and assess the credibility of witnesses. *State* v. *Blevins,* 13 Conn. App. 413, 417, 536 A.2d 1002 (1988). After careful review of the record, we cannot conclude that it was clearly erroneous for the trial court to conclude that Wheeler consented to the police entry into her house.

## II

The defendant next claims that the trial court should have found that the police conducted an unconstitutional search of the shopping bag that contained his clothes. We disagree.

At the outset, we note that, while it is not this court's function to find facts; *State* v. *Reagan,* supra; since the defendant challenges the trial court's factual and legal conclusions, we may look not only to the facts set forth in its memorandum of decision to see if they are legally and logically correct, but to the evidence in the whole record to see if those facts are clearly erroneous. *State* v. *Zindros,* supra, 238. We also may resort to the evidence produced in support of the court's ruling on a suppression motion when, as here, the court does not make detailed factual findings to support its decision. *State* v. *Martin,* 2 Conn. App. 605, 614, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985).

Our review of the record discloses the following undisputed facts relative to this issue. At about 8 a.m., Logiodice was dispatched to investigate the complaint at the Peoples' residence. Later that morning, after discussing with Murray and Delehanty what he had learned from Andy Peoples, the three troopers, along with Brundage, gathered for breakfast at a restaurant in the Killingworth section of Haddam. The troopers agreed that the description Logiodice had been given fit that of the defendant and that the defendant had a reputation for narcotics involvement. Murray had known the defendant for about a year and had arrested him at least once. Murray recalled having been told by an informer six days earlier that the defendant was rumored to possess a kilo, a little more than two pounds, of cocaine. Murray also suspected the defendant of being involved with John Mann, a suspected narcotics trafficker in the Middlesex County area. At this time, the troopers did not believe there was any emergency concerning the defendant's health.

After leaving the restaurant, the four uniformed troopers drove in separate police cars to the Wheeler

house. Logiodice had with him an assigned canine trained in drug detection. En route, Logiodice and Murray stopped at a gasoline station and used a pay telephone to report their whereabouts to their barracks. Murray did not believe that any emergency existed at this time. When the troopers arrived at the Wheeler house sometime between 10 and 11 a.m., the defendant was asleep on a couch in the living room, wearing only a tee shirt and underwear. The night before, he had put his belongings, including his pants, in a shopping bag, which he placed beside the couch before going to sleep.

When Murray got out of his car, he encountered the defendant's brother, who refused to let him inside because the house belonged to his sister and brother-in-law. Michael went inside and informed Alanna Wheeler of the situation. Wheeler, who had been asleep, put on a robe and went to the door, where she encountered Murray. He and Logiodice had gone to the side door of the house while Delehanty and Brundage waited outside. When Murray asked if he could see the defendant, Wheeler asked that he wait while she went to check with the defendant. Wheeler then went into the living room, where she straightened up various items and put the shopping bag containing the defendant's pants in a closet.

Inside the house, Murray and Logiodice tried to awaken the defendant. Shortly thereafter, Logiodice left to go outside to secure his dog while Wheeler and Murray continued talking. After Wheeler agreed with Murray that medical help should be summoned, she suggested that the defendant should have a pair of pants to wear to the hospital. Murray asked Wheeler if the defendant had any clothes. Wheeler took the shopping bag containing the defendant's pants from the closet and handed it to Murray. On direct examination, Murray testified that "[a]t the time, I was not thinking

about finding any narcotics in the bag. I was merely reaching in to take out Matt's pants so they could go with him to the hospital."[5]

In its memorandum of decision, the trial court determined that the taking of the pants from the shopping bag did not constitute a search. The court found that the information the troopers had may have led them to believe the defendant might have been acting erratically at the Peoples' residence because of drugs he had taken, but that they had little reason to believe he was engaged in any illegal conduct in his sister's house. The court also found that when Murray reached into the shopping bag, he had no reason to believe it contained anything but the defendant's pants, and that his only purpose in reaching into it was to get the pants.

Our Supreme Court has stated that searches within the meaning of the fourth and fourteenth amendments "are those that arise during the course of the policeman's function of detecting and combating criminality in the community, and . . . only an intrusion into an area in which an individual has a reasonable expectation of privacy, with the specific intent of discovering evidence of a crime, constitutes a 'search' . . . . 'A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest.' . . . The term connotes hostility between the searcher and the person whose property or possessions are being searched." (Citations omitted.) *State* v. *Tully,* 166 Conn. 126, 131, 348 A.2d 603 (1974).

---

[5] Murray also testified on direct examination that he asked for the clothes "[b]ecause [the defendant] was going to the hospital in his underwear . . . I figured if you go to the hospital, you should have [your] clothes with you. Whether or not you have them on or not, you just take them with you." On redirect, he again testified that "[i]t just seemed to be the thing to do at the time. The guy's in his underwear. How's he going to get home?"

In applying these principles, we are mindful of the United States Supreme Court's admonition against attributing " 'too much significance to an overly technical definition of "search." ' " Id., 133. Although it is unquestioned that the defendant had a legitimate expectation of privacy in the shopping bag; see *State* v. *Mooney*, 218 Conn. 85, 113, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991) (privacy expectation in cardboard box and duffel bag); *State* v. *Edwards*, 214 Conn. 57, 75, 570 A.2d 193 (1990) (backpack); *State* v. *Callari*, 194 Conn. 18, 24, 478 A.2d 592 (1984), cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1985) (suitcase); *State* v. *Collins*, 150 Conn. 488, 492–93, 191 A.2d 253 (1963) (small canvas bag); our own painstaking review of the record nevertheless leads us to conclude that under the circumstances of this case, the trial court correctly determined that the taking of the pants from the bag did not constitute a search.

Although the defendant argues forcefully that the troopers' conduct discloses that their professed concern for his health was in fact a subterfuge to conceal their intention to search for incriminating evidence, we are unpersuaded. The defendant points to Murray's awareness of the informer's tip, the troopers' suspicions of his drug involvement and the fact that they stopped for breakfast before checking on his condition. He argues that had the troopers been concerned about his health, they would not have brought a dog trained in drug detection and parked their police cars in a strategic manner designed to block off the Wheeler house. Finally, the defendant points to Murray's questioning of him and Wheeler about John Mann as further indication of pretext, and claims that before Murray took the pants out of the bag, he first took out the defendant's wallet and searched it.

These arguments, however, rely wholly on testimonial evidence, which, as stated previously, is within the purview of the trial court to credit or to disregard. *State v. Blevins,* supra. Although the court recognized that the troopers previously had investigated criminal activity involving the defendant and suspected that he was a narcotics user, it did not find that they came to the Wheeler residence with the intention of discovering evidence of criminal activity or engaging in an exploratory investigation. Thus, the court chose to credit the testimony of the troopers rather than that of the defendant's witnesses in arriving at its factual findings. On the basis of our review of the record, we cannot conclude that these findings are clearly erroneous.

### III

The defendant's final claim, raised for the first time on appeal, is that the trial court failed to find that the police improperly seized the cocaine pursuant to article first, § 7, of our state constitution. We disagree.

At the outset, we note that, although this claim was not raised at the suppression hearing, review is warranted under *State v. Evans,* 165 Conn. 61, 327 A.2d 576 (1973), as refined by *State v. Golding,* 213 Conn. 233, 567 A.2d 823 (1989), because it is of constitutional magnitude in that it alleges a violation of a fundamental right.[6]

The essence of the defendant's claim is that because the troopers discovered the cocaine as a result of a

---

[6] Under *State v. Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), a defendant can prevail on such a claim "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

planned search, the trial court improperly determined that it was discovered inadvertently, within the plain view exception to the fourth amendment's warrant requirement.[7] The defendant argues that since the United States Supreme Court has recently determined that the fourth amendment does not require that evidence seized in plain view be discovered inadvertently; see *Horton* v. *California,* 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); this court should find that inadvertent discovery is required by article first, § 7, of our state constitution.

In its memorandum of decision, the trial court relied on *State* v. *Hamilton,* 214 Conn. 692, 573 A.2d 1197, vacated and remanded, 498 U.S. 933, 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990), in determining that seizure of the cocaine was proper because the troopers were on the premises lawfully, discovered the narcotic inadvertently and had probable cause to believe that a reasonable relationship existed between the evidence seized and the defendant's conduct. Although we agree with the defendant that the trial court improperly relied on *State* v. *Hamilton,* supra, we conclude that the result it reached nevertheless was proper under our state constitution.

Prior to *Hamilton,* the Connecticut Supreme Court repeatedly applied the inadvertence limitation as an element of the plain view doctrine. See *State* v. *Reddick,* 207 Conn. 323, 335, 541 A.2d 1209 (1988); *State* v. *Altrui,* 188 Conn. 161, 179, 448 A.2d 837 (1982); *State* v. *Graham,* 186 Conn. 437, 443–44, 441 A.2d 857

---

[7] The plain view doctrine, created by a plurality of the United States Supreme Court in *Coolidge* v. *New Hampshire,* 403 U.S. 443, 464–73, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), "is based upon the premise that the police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant or are otherwise entitled to be in a position to view the items seized." *State* v. *Ruth,* 181 Conn. 187, 193, 435 A.2d 3 (1980).

(1982); *State* v. *Federici,* 179 Conn. 46, 56, 425 A.2d 916 (1979); *State* v. *Watson,* 165 Conn. 577, 587, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974); *State* v. *Krause,* 163 Conn. 76, 82–83, 301 A.2d 234 (1972). The court also held, however, that "inadvertence is not required if the items seized fall under the category of contraband, stolen property or objects dangerous in themselves." *State* v. *Couture,* 194 Conn. 530, 547, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see *State* v. *Ruscoe,* 212 Conn. 223, 237 n.8, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). Because the cocaine seized in this case constitutes contraband; see *State* v. *Hamilton,* supra, 701, citing *State* v. *Ruscoe,* supra, 238; the protection of our state constitution would be unavailing to the defendant even if we were to find that article first, § 7, requires an inadvertence limitation on the plain view doctrine. We conclude, therefore, that the trial court properly determined that seizure of the cocaine was not improper.

The judgment is affirmed.

In this opinion the other judges concurred.