STATE OF CONNECTICUT *v.* DONALD FIELDS
(10978)

LAVERY, LANDAU and HEIMAN, Js.

Argued January 8—decision released May 18, 1993

*Ramona S. Carlow,* special public defender, for the appellant (defendant).

*Maureen M. Keegan,* assistant state's attorney, with whom, on the brief, was *John A. Connelly,* state's attorney, for the appellee (state).

LAVERY, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2),[1] assault of a victim sixty or older in the third degree in violation of General Statutes

---

[1] General Statutes § 53a-101 provides in pertinent part: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

§ 53a-61a,[2] and unlawful restraint in the first degree in violation of General Statutes § 53a-95.[3] The defendant was also charged with and acquitted of larceny in the second degree in violation of General Statutes § 53a-123 (a) (3), and larceny in the fourth degree in violation of General Statutes § 53a-125 (a). The defendant claims that the trial court improperly (1) denied his motion to suppress the victim's out-of-court identification of the defendant and subsequent in-court identification of the defendant, (2) denied his motion to suppress evidence seized during the search of his apartment, (3) denied his motion to suppress his statement to the police, (4) denied his motion for acquittal because the state did not present sufficient evidence to sustain conviction on the charge of burglary in the first degree, and (5) denied his motion for acquittal because the state did not present sufficient evidence to sustain conviction on the charge of unlawful restraint in the first degree. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On November 23, 1990, the victim, a sixty-eight year old woman, was awakened in her Waterbury house at approximately 7:30 a.m. by a loud noise. When she heard the shelves in the hallway outside her bedroom being knocked over, she turned over in her bed to see what had caused the noise. The victim saw a heavyset African-American man in her hallway, who appeared to be in his late twenties and whom she later identified as the defendant.

---

[2] General Statutes § 53a-61a (a) provides: "A person is guilty of assault of a victim sixty or older in the third degree when he commits assault in the third degree under section 53a-61 and the victim of such assault has attained at least sixty years of age or is blind or physically disabled, as defined in section 1-1f."

[3] General Statutes § 53a-95 provides: "(a) A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury.

"(b) Unlawful restraint in the first degree is a class D felony."

When the victim asked the defendant what he was doing in her house, he responded, "I'll show you what I'm doing here." The defendant approached the victim, put his arms around her, turned her around, pushed her into the mattress and against the headboard of the bed and choked her until she lost consciousness.

When the victim regained consciousness, she was initially disoriented. She eventually determined that she was in the closet in her bedroom, and that clothing and bed linens had been thrown on top of her. Unable to open the closet door, she attempted, in vain, to knock a hole in the door with a shoe, and cried out for help. The victim ultimately was able to fit her hand and arm through an opening between the closet door and frame, and to manipulate a chair that was propped up against the door until it fell. She was then able to open the door. Upon escaping from the closet, the victim saw that a cedar chest, normally kept at the foot of her bed, had been moved against the kitchen chair that had been blocking the closet door.

The victim immediately contacted the police. She found her purse, which she normally kept in a hamper, on the kitchen floor. Missing from her purse was $600. She also noticed that the earrings she had been wearing were missing.

The first officer on the scene, Arthur Denze of the Waterbury police department, arrived at approximately 12:45 p.m. Denze observed that the victim was visibly shaken and had marks on her face and neck consistent with her claim of having been assaulted. After surveying the scene, Denze concluded that forcible entry of the house had occurred through the back door. The victim gave the officer a physical description of her assailant, and also described the items that had been taken. Denze summoned an ambulance to take the victim to the hospital. Denze also contacted the detective

bureau of the Waterbury police department. Shortly after Denze placed the call, and after the victim had been taken to the hospital, Detective John Maia arrived.

Denze showed Maia around the house. Maia agreed with Denze that the only point of entry was the forced entry through the back door. Denze relayed to Maia the description of the perpetrator that the victim had given. Maia then called Sergeant John Augelli, and furnished information about the scene and what had transpired. On the basis of his conversation with Maia, Augelli and another detective, Joseph Pesce, went to find the defendant for questioning.

At approximately 2 p.m., Detective Martin Mancinelli arrived to process the crime scene. Mancinelli dusted the house for latent fingerprints and took photographs. He observed that forced entry to the house had been gained through either kicking or pushing the back door. Mancinelli dusted the top of the cedar chest, which had been placed in front of the closet door, for latent fingerprints. Although no latent fingerprints were found on the chest, a footwear impression was found. Mancinelli brought the top of the cedar chest to the police department and turned it over to the director of the forensic laboratory.

After returning to the detective bureau with Mancinelli, Maia proceeded to St. Mary's Hospital to check on the victim's condition. Maia observed that, although the victim had bruises on her face and arms, she was fully alert and responsive. Maia asked the victim if she would be able to identify her assailant, and she responded that she could. Maia returned to the detective bureau and prepared a photographic array of nine African-American males, including the defendant.

Maia went back to the hospital and showed the array to the victim. The victim studied each photograph, and,

within a matter of seconds, selected the defendant as the man who had broken into her house and assaulted her that morning.

In the meantime, Augelli and Pesce were attempting to contact the defendant for questioning. They first went to the defendant's place of employment, but were told that the defendant had not reported for work. The officers went to the defendant's residence, which was one-half mile from the defendant's apartment. Pesce went to the front door, and Augelli went to the back. When Pesce knocked on the front door, the defendant tried to leave by the back and encountered Augelli. The defendant agreed to go to the detective bureau with the officers.

At the detective bureau, after being apprised of his constitutional rights, the defendant denied knowledge of and involvement in the burglary of the victim's house. The defendant was asked if he would consent to a search of his apartment for evidence related to the burglary. After the consent form was explained to him, the defendant read and signed the form. Pesce also signed the form.

Prior to Augelli's leaving the bureau to return to the defendant's house to conduct the consensual search, Mancinelli arrived at the bureau with the top of the cedar chest. Augelli observed that a Jordache sneaker had made the visible print on the chest. Augelli looked at the sneakers the defendant was wearing, and determined that those sneakers could not have made the print.

Pesce, Augelli and the defendant returned to the defendant's apartment. Pesce searched the second floor, while Augelli searched the first floor. While none of the items stolen from the victim was found during the search, a pair of black, well-worn Jordache sneakers were found in a first floor closet.

The defendant, his girl friend, and the officers returned to the bureau. The defendant was interviewed by Lieutenant Robert Deely. After again being advised of and waiving his constitutional rights, the defendant gave a statement to the police detailing his involvement in the burglary and assault. The defendant admitted entering the victim's house, assaulting her, barricading her in the closet and looking through drawers in her house.

The Jordache sneakers, seized during the search of the defendant's apartment, were turned over to James McDonald, director of the Waterbury police forensic lab. McDonald concluded that the print on the cedar chest top was made by one of the defendant's sneakers seized during the search of his apartment, and testified to that effect at trial.

At trial, the defendant testified on his own behalf. He claimed that, contrary to the evidence presented by the state's witnesses, he did not burglarize the victim's house and assault the victim on the morning of November 23, 1990. The defendant testified that he awoke after 8 a.m. that day and made coffee. He then walked to a restaurant and ordered a carryout breakfast and went to a convenience store. After eating breakfast at home, he decided to rent some films. On his way home from the video store, he called Domino's Pizza and ordered a pizza. The defendant said he went home to watch the films, and that the pizza arrived at approximately 12:30 p.m.

The defendant stated that he was not advised of his rights at the police station, and did not consent to a search of his apartment. He also claimed that he did not give an inculpatory statement to the police, but rather denied involvement in the burglary, and signed two blank sheets of paper that he was told would be filled in with his statement of denial.

## I

The defendant's first claim is that the trial court improperly denied his motions to suppress the victim's out-of-court and in-court identifications of him as the perpetrator of the burglary and assault. The defendant claims that the court's denial of his motion to suppress deprived him of his right to due process under both the United States and Connecticut constitutions. We disagree with this claim.

Upon review of a trial court's denial of a motion to suppress, "[t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. *State* v. *Cofield,* 220 Conn. 38, 44, 595 A.2d 1349 (1991)." (Internal quotation marks omitted.) *State* v. *MacNeil,* 28 Conn. App. 508, 512–13, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). The trial court's "factual findings will be reversed only if they are clearly erroneous. *State* v. *Jones,* 193 Conn. 70, 79–80, 475 A.2d 1087 (1984); *State* v. *Zindros,* 189 Conn. 228, 244, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984)." *State* v. *MacNeil,* supra, 513. Our review of the trial court's action "involves a two part procedure. First, where the court's legal conclusions are challenged, we must decide if they are legally and logically correct, and if they are supported by the facts set forth in the memorandum of decision. *State* v. *Zindros,* supra, 238. Second, if the factual basis of the court's decision is challenged, we must determine whether the facts in the memorandum are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. Id." *State* v. *MacNeil,* supra.

The defendant claims that the photographic array from which the victim identified the defendant was

unnecessarily suggestive, and its use abridged his due process rights. The defendant properly points out that the "due process clause of the fourteenth amendment to the United States constitution requires the exclusion of identification evidence—including, as here, an in-court identification and testimony concerning a pretrial photographic identification—when the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of an irreparable misidentification. *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Biggs,* 13 Conn. App. 12, 17, 534 A.2d 1217 (1987), cert. denied, 207 Conn. 801, 540 A.2d 73 (1988).

"[I]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. *State* v. *Ramsundar,* 204 Conn. 4, 10, 526 A.2d 1311, [cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374] (1987) . . . ." (Internal quotation marks omitted.) *State* v. *Pollitt,* 205 Conn. 132, 162, 531 A.2d 125 (1987). A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure. "To prevail in his claim the defendant must demonstrate that the trial court erred in *both* of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . *State* v. *Mayette,* 204 Conn. 571, 581, 529 A.2d 673 (1987)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Pollitt,* supra.

The defendant claims that the pretrial photographic identification procedure used in this case was unnecessarily suggestive because the color intensity of the defendant's photograph is different from that of the other photographs, the defendant's face is more prominent in his photograph than the faces in the other photographs, the defendant's photograph was placed in the first position (the upper left hand corner of the card), and only one other man in the array, according to the defendant, could be described as heavyset or big. The defendant concedes that differences in color intensity and prominence of the defendant's face do not render an array unnecessarily suggestive. *State* v. *Boscarino,* 204 Conn. 714, 727, 529 A.2d 1260 (1987); *State* v. *McKnight,* 191 Conn. 564, 571–73, 469 A.2d 397 (1983). The defendant, claims, however, that the color intensity and facial prominence of the defendant's photograph, combined with the position of the photograph and the alleged difference between his build and age and those of the men in seven of the remaining photographs, make the identification procedure unnecessarily suggestive.

In support of his position that seven of the eight remaining photographs in the array could be eliminated on the basis of the age and build of the men depicted, the defendant relies on *State* v. *Small,* 1 Conn. App. 584, 474 A.2d 460 (1984). In that case, we held that a photographic array was unnecessarily suggestive when seven of the eight photographs could be eliminated because three photographs had names on them other than that by which the witness knew the defendant, two of the photographs depicted persons substantially younger than the defendant, and two of the photographs depicted individuals much heavier than the defendant. Id., 587–88. The present case is clearly distinguishable from *Small.* Here, the trial court articulated its decision on the motions to suppress. With

respect to the photographic array, the trial court stated: "I've seen the array and I find that the pictures . . . do substantially represent a black male of the age of thirty-one and do look sufficiently like each other so as not to be overly suggestive." The trial court noted that it was familiar with the factors it must consider when weighing identification evidence as set forth in *Manson* v. *Braithwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).[4] In addition to its finding that the photographic array was not overly suggestive, the trial court reviewed the identification process. The court concluded: "There's nothing to show that Detective Maia guided [the victim's] choice in any way whatever, and since I found that the photo is not overly suggestive, I don't have to go further, but I do find from her statement that she chose that photo because she remembered what her assailant looked like, that it's reliable, and this meets both prongs of *Manson* v. *Braithwaite* [supra]." It is clear that the trial court carefully reviewed the evidence in question and correctly determined that it was not unnecessarily suggestive. It is also clear from the record that the trial court carefully reviewed the identification process, and found that it met constitutional standards. After careful review of the record and the trial court's findings, we conclude that the trial court properly denied the defendant's motion to suppress the victim's pretrial identification of the defendant.

The defendant further claims that the trial court should have suppressed the victim's in-court identification of the defendant because that identification was tainted by the previous, allegedly flawed pretrial iden-

---

[4] These factors include: "[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Braithwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

tification that we have discussed. Because that identification process was proper and not unnecessarily suggestive, the defendant's claim that the victim's in-court identification was tainted and should have been suppressed is without merit. Since the initial identification of the defendant was not the result of a suggestive identification procedure, there was no constitutional infirmity in the identification process. See *State* v. *Miller*, 202 Conn. 463, 474, 522 A.2d 249 (1987). We therefore conclude that the trial court properly denied the defendant's motion to suppress the victim's in-court identification.

## II

The defendant next claims that the trial court improperly denied his motion to suppress a pair of his sneakers as tangible evidence because the sneakers were beyond the scope of the defendant's consent to search. We disagree.

The following facts are pertinent to the resolution of this issue. Investigation of the burglary of the victim's house on the morning of November 23, 1990, led the Waterbury police to the defendant's apartment. When police officers encountered the defendant, he agreed to go to the police station with them. The defendant denied any involvement in the burglary. Sergeant Augelli asked the defendant if he would consent to a search of his apartment. Augelli explained to the defendant that, if he chose not to consent, the police would have to obtain a search warrant. Augelli showed the defendant a consent form and explained its significance. Augelli informed the defendant that the detectives would be searching for jewelry, money and a pair of sneakers. After the consent form was completed, Augelli read the form aloud, explained it to the defendant and asked him to read it. The defendant read the form and then signed it.

The defendant testified at the suppression hearing that he gave neither oral nor written consent for the search. On appeal, the defendant maintains that he never gave oral or written consent to the police, and, because the consent form is missing, there is no way for this court to review the details of that form.

After both sides had presented their evidence in the suppression hearing, the trial court specifically found that the defendant and his girl friend (now wife) consented to the search of the apartment, and did not limit the areas to be searched.[5]

One of the most fundamental propositions of our criminal jurisprudence "is that 'searches and seizures inside a home without a warrant are presumptively unreasonable.' " *State* v. *MacNeil,* supra, quoting *Payton* v. *New York,* 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin,* 190 Conn. 440, 446, 461 A.2d 963 (1983). "A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution . . . when a person with authority to do so has freely consented. *State* v. *Reagan,* 209 Conn. 1, 7, 546 A.2d 839 (1988). It is the state's burden to prove that the consent was freely and voluntarily given, and that the person who purported to consent had author-

[5] The trial court made the following findings orally and in open court with respect to the defendant's motion to suppress the sneakers as evidence: "Now, the written consent to search has apparently been lost. But the consent to search, as a matter of law, need not be in writing. I chose to believe Sergeant Augelli and I will find that the police returned with the defendant and the consent to search the apartment whereupon they spoke with Miss Wheeler, now Mrs. Fields, and she also gave them consent to search. There's been no testimony here that Mrs. Field's consent to search was involuntary. There's been no testimony that the consent to search was limited to any specific part of the apartment either. The consent that I find was given by Mr. Fields or the consent that Mrs. Fields testified that she gave. The sneakers, therefore, can be admitted into evidence at the trial . . . ."

ity to do so. *Bumper* v. *North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); *State* v. *Reagan,* supra. Such consent may not be established by mere acquiescence to police authority. *State* v. *Jones,* [193 Conn. 70, 79, 475 A.2d 1087 (1984)]." *State* v. *Mac-Neil,* supra.

"[W]hether consent was freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. *State* v. *Reagan,* supra, 7–8, quoting *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). [The issue of consent] is to be decided by the trial court on the basis of the evidence before it that it finds credible, along with the reasonable inferences that may be drawn from that evidence. *State* v. *Reagan,* supra, 8; *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978). The ultimate question is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." (Internal quotation marks omitted.) *State* v. *MacNeil,* supra, 514.

The trial court made specific findings regarding the defendant's and his girl friend's consent to search their apartment. The trial court credited the testimony of Augelli, who testified that the defendant had signed a consent form after careful consideration of its contents. Where, as here, there is conflicting testimony, we must be mindful that it is uniquely the function of the trier of facts to weigh the evidence and assess the credibility of witnesses. Id. The trial court also correctly stated that a consent to search does not have to be in writing to be valid.[6] Our careful review of the record

---

[6] Because a consent to search does not have to be in writing to be valid, the defendant's claims that this court cannot review any detail that may have been contained in the consent form is without merit. The trial court specifically found that consent had been given, and that the consent was not limited.

and the trial court's findings leads us to conclude that the trial court properly denied the defendant's motion to suppress the sneakers as tangible evidence.

## III

The defendant claims that the trial court improperly failed to exclude from evidence the defendant's statement to the police. He argues that the statement was the result of improper police conduct in allegedly illegally seizing the defendant's sneakers.

In presenting this claim, the defendant relies on the exclusionary rule, barring the admission of illegally obtained evidence. We have concluded that the trial court properly ruled that the police searched the defendant's apartment and seized the defendant's sneakers with the defendant's freely given consent. In doing so we concluded that the consensual search of the defendant's apartment and the consequent seizure of the defendant's sneakers complied with the law. In light of these conclusions, the defendant's claim that the defendant's later inculpatory sworn statement to the police resulted from police misconduct in obtaining the defendant's sneakers is without merit.

## IV

The defendant next claims that the state failed to present sufficient evidence to sustain the jury's guilty verdict on the charge of burglary in the first degree as charged in the substitute information. We disagree.

"This court's role in evaluating the sufficiency of the evidence in a jury trial is well established. 'We first construe the evidence presented at trial in a light most favorable to sustaining the verdict, and then determine whether the jury could reasonably have found upon the facts established and the inferences reasonably drawn therefrom, that a cumulative effect of the evidence established guilt beyond a reasonable doubt. . . .' (Cita-

tions omitted; internal quotation marks omitted.)" *State* v. *Baldwin,* 224 Conn. 347, 368, 618 A.2d 513 (1993). Reasonable and logical inferences may be drawn, but the jury may not resort to speculation and conjecture. *State* v. *King,* 216 Conn. 585, 601, 583 A.2d 896 (1990). Each essential element of the crime must be proved beyond a reasonable doubt. Id.

The defendant claims specifically that the state failed to prove that the defendant intended to commit larceny when he broke into the victim's home. In presenting this argument, the defendant points out that the state, in its bill of particulars and substitute information, charged that the defendant entered the victim's house with the intent to commit larceny. The defendant reasons that because he was acquitted of the larceny counts and because the evidence presented at trial does not, in his view, prove that he intended to commit larceny, the jury erroneously rendered a verdict of guilty on the burglary count, and the trial court improperly denied his motion to acquit.

The defendant was charged with violating General Statutes § 53a-101 (a) (2), which provides in pertinent part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone." The state's bill of particulars and substitute information charged, in pertinent part, that the defendant "entered and remained unlawfully in a building, to wit, 858 Frost Road, Waterbury, Connecticut, with intent to commit the crime of larceny therein . . . ."

Although the defendant in this case was acquitted of the larceny counts against him, his burglary conviction does not necessarily fail. "Where . . . the claim

is that the crime intended to be committed by the burglar was larceny, the fact that there is no actual larceny does not bar a conviction for burglary. *State* v. *Benton,* [161 Conn. 404, 411, 288 A.2d 411 (1971)]; see *People* v. *Johnson,* 28 Ill. 2d 441, 443, 192 N.E.2d 864 (1963); 12A C.J.S., Burglary § 42. The larceny, if committed, is a separate and distinct offense. *State* v. *Benton,* supra; *Wilson* v. *State,* 24 Conn. 57, 65 (1855)." *State* v. *Little,* 194 Conn. 665, 675–76, 485 A.2d 913 (1984).

Because the defendant in this case was acquitted of the larceny charges against him, we must look to the circumstances surrounding the burglary to determine if the jury could reasonably conclude that the defendant intended to commit larceny when he entered the victim's house. "Generally, intent can only be proved by circumstantial evidence, and, being a mental state, it is proved by the conduct of that person whose conduct is being scrutinized." Id., 675, and cases cited therein. In this case, the jury was presented with evidence establishing that the defendant forcibly entered the victim's house. The defendant, upon being discovered in the house by the victim, assaulted her, rendered her unconscious, and barricaded her in a closet. When she regained consciousness, the victim discovered that money and a pair of earrings were missing. The statement that the defendant gave the police at 6 p.m. was entered into evidence as state's exhibit N. In that statement, the defendant described how he and a friend decided to "break into a house" on the morning of November 23, 1990. The defendant stated that after he and his friend broke in through the back door, his friend went to the front door to act as a lookout. He stated that he and his friend searched the house, and noted specifically that he was "searching and looking through drawers." The defendant stated that his friend left the house first, and con-

cluded that "[i]f anything is missing from the house, it is Andre Stevens who has it because I didn't get anything."

"The time, manner and forcible nature of the entry permitted a reasonable inference, based on human experience, that the unlawful entry by the defendant was hardly without purpose, but rather was with the intent to commit a crime therein." Id. In this case, the state presented the jury with ample evidence for it to conclude reasonably that the defendant entered the victim's house with the intent to commit larceny.

The defendant's argument that, because he was acquitted of the separate larceny counts, it necessarily follows that the state failed to present sufficient evidence to convict him of burglary as charged is without merit. Although the defendant has presented this claim in terms of sufficiency of the evidence, the claim is based on the defendant's assumption that the jury's acquittal on the larceny charges and conviction on the burglary charge are inconsistent. "The short answer to this claim is that inconsistency of the verdicts is immaterial." State v. Rosado, 178 Conn. 704, 708–709, 425 A.2d 108 (1979); Hamling v. United States, 418 U.S. 87, 101, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974); Dunn v. United States, 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932); State v. Manning, 162 Conn. 112, 122, 291 A.2d 750 (1971).

## V

The defendant's final claim is that the state presented insufficient evidence to convict him of unlawful restraint in the first degree. The defendant claims that the state failed to prove beyond a reasonable doubt that the defendant exposed the victim to a substantial risk of physical injury as required for conviction under General Statutes § 53a-95 (a) by confining her in the bedroom closet. We disagree, noting that our case law does

not limit the period of exposure to injury merely to the confinement, but to the entire the course of restraint. *State* v. *Monk,* 198 Conn. 430, 503 A.2d 591 (1986); *State* v. *Parham,* 174 Conn. 500, 391 A.2d 148 (1978).

In reviewing this sufficiency of the evidence claim, we rely again on the well settled test that we have described in this opinion. A review of the evidence pertinent to this claim reveals that the victim observed the defendant from her bed and asked him what he was doing in her house. The defendant said, "I'll show you what I'm doing," and proceeded to grab the victim and choke her until she lost consciousness. The defendant then placed the unconscious victim on the floor of her closet, covered her with bed linens and other items, and barricaded the closet door with a chair and a cedar chest. More than five hours elapsed from the time the victim lost consciousness until the time she was able to escape from the confines of her closet. The victim suffered bruises and other minor injuries as a result of the assault.

Under General Statutes § 53a-91 (1) restrain means "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with [her] liberty by moving [her] from one place to another, or by confining [her] either in the place where the restriction commences or in a place to which [she] has been moved, without consent." Under the circumstances of this case, the defendant's grabbing and holding the victim and then choking her were actions in furtherance of the restraint that culminated in the defendant's barricading the victim in the closet.

We conclude that the jury, viewing the entirety of the evidence, could conclude that the victim was exposed to a substantial risk of injury throughout the ordeal. In *State* v. *Monk,* supra, 434, our Supreme Court noted that the defendant's actions satisfied the

exposure to substantial risk of physical injury require-
ment when it was shown that the victim struggled and
that the defendant choked her. In that sexual assault
case, the jury could have found that had the victim con-
tinued to struggle and resist, she might have been seri-
ously injured. Here, the elderly victim was rendered
unconscious, and, while unconscious, was placed on the
floor of a closet under linen and clothing. "[T]he state
[is] not required to prove actual injury, but only that
the defendant exposed the victim to substantial risk
of physical injury." Id., 434–35. Our careful review of
the record reveals that the state provided the jury with
ample evidence to conclude that the defendant, through
his actions during the course of the restraint, exposed
the victim to a substantial risk of physical injury.

The judgment is affirmed.

In this opinion the other judges concurred.