[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. CT Page 6123
Jose Luis Rodriguez, the defendant, is charged in a four count information with possession of narcotics with intent to sell in violation of *21a-278(a) and *21a-277(a) of the Connecticut General Statutes. These charges arise out of the defendant's February 7, 1995 arrest; the search of his person incident to that arrest; and the searches of his 1987 blue Honda automobile and apartment #59 at 330 East Main Street, Waterbury, Connecticut.
Rodriguez has moved under both the federal and state constitutions to suppress all the illegal drugs seized by the police and claims that these seizures violated his constitutionally protected rights. The court conducted six days of evidentiary hearings on this motion. Both the state and the defendant have submitted post-hearing memoranda.
The motion to suppress is granted as to the seizure of drugs from the defendant's person incident to the arrest and the seizure of drugs from his automobile. The motion, however, is denied with regard to the seizures from apartment #59.
 II.
In early 1995, members of the Waterbury police department's gang task force received information from confidential informants that an individual was a mid-to-high level narcotics dealer and operating out of an apartment at 330 East Main Street, Waterbury. The informants described this individual as an hispanic male, 6 feet tall, 180 pounds and known as Poppi Sanchez. The informants also indicated that this person drove a blue Honda automobile. In response to this information, police officers, prior to February 7, 1995, periodically placed 330 East Main Street under surveillance from a vantage point across the street from the apartment building. Three of the officers involved in this surveillance were Officer Scott O'Connor, now a detective; Detective Michael Gugliotti; and Officer Randolph Velez.
At the suppression hearing, Detective O'Connor testified to the following. During the surveillances prior to February 7, 1995, he observed the defendant, who fit the description given by the confidential informants, periodically enter and exit 330 East Main Street via a fire escape and meet various individuals in and at a blue Honda, parked in the lot adjacent to the apartment building. O'Connor related that he saw the defendant engage in what appeared to be preplanned meetings and hand-to-hand transactions, all, in CT Page 6124 his opinion consistent with narcotics dealing. He also recognized known drug users in some of these transactions with the defendant.
On February 7, 1995, at approximately 7:00 P.M., O'Connor, with Detective Gugliotti and Officer Velez, again took up a surveillance of 330 East Main Street. Over the next three hours, the officers observed the defendant enter and exit the apartment building and meet with various individuals, including known drug users, at the blue Honda. O'Connor also testified to witnessing the defendant make transactions outside the vehicle.
At 10:00 p. m., after observing Rodriguez drive off in the Honda, O'Connor climbed up the apartment building's fire escape to the fifth floor and entered that floor's common hallway. He testified that he did this to ascertain which particular apartment the defendant used. Soon after, O'Connor was notified by Velez and Gugliotti via radio that Rodriguez had returned to the apartment building. O'Connor, while still in the fifth floor hallway, observed Rodriguez enter apartment #59. O'Connor then retreated back to the fire escape. While waiting on the fire escape, he observed Rodriguez in the process of exiting the building, descending to the parking lot and proceeding to the Honda. At this point, O'Connor radioed Gugliotti and Velez that he was going to stop the defendant to investigate his activities. O'Connor testified that he had no intent at that time to arrest Rodriguez.
According to O'Connor, at this legally critical moment, while Rodriguez sat in the Honda, O'Connor approached the vehicle, knocked on the window and displayed his badge. He said he then observed the defendant throw something to the floor of the Honda. Then, O'Connor related Gugliotti and Velez arrived at the passenger side of the Honda, and were informed by O'Connor what he had just seen. O'Connor stated that one of the officers then shined his flashlight into the Honda, whereby O'Connor saw two packages of what appeared to be narcotics on the floor of the Honda. He said Gugliotti then opened the passenger door of the vehicle and seized the two packages. Thereupon, O'Connor proceeded to arrest Rodriguez for narcotics possession. While searching Rodriguez incident to his arrest, O'Connor found a third bag on the defendant's person. At this time, Sergeant Michael Ricci arrived at the scene and directed O'Connor to obtain a consent to search form at the police station and bring it to 330 East Main Street. O'Connor and Gugliotti then took the defendant across the street to the police station and placed him in a holding cell. CT Page 6125
The second member of the surveillance team was Detective Michael Gugliotti. His testimony as to the events leading up to and including February 7, 1995 is as follows. Gugliotti related that on surveillances prior to that date, he also saw the defendant conduct transactions with others in the parking lot. Gugliotti also observed the defendant occasionally leave the lot in the Honda and return a short time later. This activity appeared to Gugliotti to be consistent with drug runs.
Concerning the night of February 7, 1995, Gugliotti testified O'Connor entered the apartment building at approximately 10:00 P.M. Gugliotti confirmed receiving O'Connor's radio message that Rodriguez was exiting the building. The officers then agreed to approach the defendant to investigate his activities. Gugliotti admitted having no intention of arresting the defendant at this time, since he had not seen anything of a criminal nature providing a basis for an arrest. Gugliotti and Velez then left the site of their surveillance in their vehicle to assist O'Connor in this investigation.
Gugliotti in his testimony related that he and Velez crossed Baldwin Street in their vehicle and proceeded into the parking lot adjacent to 330 East Main Street where the Honda was parked. Gugliotti then went to the passenger side of the Honda, and was informed by O'Connor that O'Connor had seen the defendant throw "something" to the vehicle's floor. In response to that information, Gugliotti said that he then opened the passenger door of the Honda while O'Connor "simultaneously" removed Rodriguez from the vehicle. According to Gugliotti, only then did he see, with the aid of his flashlight, two packages of what appeared to be drugs. He then seized the two bags.
The third member of the gang task force conducting surveillance on February 7, 1995 was Officer Randolph Velez. Velez' testimony, which the court deems credible as to the events leading up to and including February 7, 1995 is as follows. Velez confirmed that at the outset of that particular evening he sat in the unmarked police car with O'Connor and Gugliotti, and observed activity in the parking lot adjacent to 330 East Main Street. He, too, reported seeing Rodriguez on at least three occasions exit the building and rendezvous with persons at the blue Honda. Some of these persons Velez also knew to be drug users and dealers. Velez testified that at approximately 10:00 p. m., after Rodriguez had driven away from the premises in the Honda, O'Connor entered the fifth floor of the apartment building via the fire escape. Velez CT Page 6126 confirmed observing Rodriguez return, and then warning O'Connor of Rodriguez' impending arrival. Velez said that when the defendant left the building a short time later, O'Connor radioed to Velez and Gugliotti that he had decided to "pick off" the defendant. According to Officer Velez by "pick off", he means stop and detain the defendant for investigatory purposes. Velez stated that after O'Connor radioed his intention to stop Rodriguez, Velez, with Gugliotti driving their unmarked vehicle, approached the parked Honda. Significantly to the court, Velez indicated that upon arriving from their surveillance site, and prior to his and Gugliotti's exiting their vehicle, Velez saw O'Connor pull the defendant out of his Honda and attempt to handcuff him. Because of a struggle between O'Connor and Rodriguez, Velez went to the assistance of O'Connor. According to Velez, with Rodriguez already outside the vehicle, O'Connor then informed Gugliotti as to the presence of drugs in the Honda which Gugliotti subsequently seized.
Upon this record the state contends that the police lawfully discovered in plain view the drugs in the Honda, which then led to Rodriguez' arrest and subsequent search of his person. In support of this position, the government relies on State v. Sailor,33 Conn. App. 409, cert. denied, 229 Conn. 911 (1994). At no time has the state argued, nor have the police officers testified that initially they had reason to arrest Rodriguez. The court accepts the case as framed in this regard by the state.
The court begins its legal analysis of the factual circumstances leading to Rodriguez' arrest mindful that the police officers were acting without a warrant. It is axiomatic that a warrantless seizure or search is per se unreasonable unless the state proves by a preponderance of the evidence that the seizure or search falls within one of the exceptions to the warrant requirement. State v. Trine, 236 Conn. 216, 235 (1996); see alsoState v. Ortiz, 17 Conn. App. 102, 103, cert. denied, 209 Conn. 828
(1988). Thus, where, as here, the defendant is seized without a warrant and his person and auto searched, the state must prove the legitimacy of such warrantless conduct.
The court finds the evidentiary record comprising the testimony of the three police officers, O'Connor, Gugliotti and Velez, to be contradictory and confusing concerning the critical events leading to the arrest of Rodriguez. O'Connor testified that when approaching Rodriguez in the parking lot, he intended only to investigate, and did not proceed to arrest him until Gugliotti retrieved the drugs. Gugliotti, on the other hand, testified that CT Page 6127 he opened the passenger door of the Honda while O'Connor "simultaneously" removed Rodriguez from the vehicle, and only then did he see the two packages. Velez, whom the court finds most credible as to this aspect of the case, related that upon approaching the Honda, he witnessed O'Connor remove Rodriguez from the Honda and struggle to handcuff him before Velez and Gugliotti exited their vehicle. The testimony of these officers as to the critical facts surrounding the defendant's arrest is in conflict and fails to persuade the court that the warrantless arrest of Rodriguez was based upon probable cause. State v. Gant,231 Conn. 43, 63 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1404,131 L.Ed.2d 291 (1995); State v. Dennis, 189 Conn. 429, 431 (1983); see also State v. Oguendo, 223 Conn. 635, 657 (1992)
Concerning the warrantless search of the Honda, the state relies primarily on State v. Sailor, supra, 33 Conn. App. 409. The court finds this reliance misplaced. In Sailor, the Appellate Court approved the seizure because the police, while on a public street, saw the plastic bag inside that defendant's automobile. Id., 416-17. This court finds, however, from this record that no police officer, including O'Connor, saw any such bags in the vehicle until Gugliotti opened the passenger side door and with the aid of his flashlight, discovered the drugs in question. Although O'Connor on direct examination testified that he saw the defendant throw "two small bags" to the floor of the Honda, on cross examination, he conceded that he saw no such items until Gugliotti flashed his light into the car. Gugliotti, on the other hand, testified that he did not turn on his flashlight until after opening the passenger side door. Additionally, the record does not reveal, and the court does not find, that Gugliotti, based on the plain view doctrine, had a basis independent of O'Connor's activities to enter the vehicle and seize the narcotics. Id., 416. Finally, there is no evidence in this record that the search of the Honda was for weapons and thus for the protection of the officers, nor has the state made such a claim. State v. Wilkins,240 Conn. 489, 497-98 n. 11 (1997).
Accordingly, the court concludes that the state has failed to prove an exception to the warrant requirement. Based upon this record, the court concludes that the warrantless searches and seizure are unreasonable and in violation of the defendant's rights under the fourth amendment of the United States Constitution and Article First, *7 of the Connecticut Constitution. Under the exclusionary rule, evidence found to be the fruit of a prior illegal or unconstitutional search must be ordered suppressed by CT Page 6128 the court. See State v. Ortiz, 14 Conn. App. 493, 501, cert. denied, 209 Conn. 804 (1988). The court, therefore, grants the motion to suppress as to the seizure of drugs from the defendant's person incident to the arrest, and the seizure of drugs from his automobile.
 III.
Rodriguez also moves to suppress the drugs seized from apartment #59. He claims that the consent to search that apartment was not freely given and thus, the warrantless seizures from the apartment were illegal. On the other hand, the state claims this search was based on consent and the resultant seizures were legally proper. — The court concludes that the search of apartment #59 was consensual and the subsequent seizures were, according to law, permissible.
"It is axiomatic that `[a] warrantless search [or entry into one's home] is not unreasonable under either the fourth amendment to the constitution of the United States or article first, *7, of the constitution of Connecticut if a person with authority to do so has freely consented. . . . Schneckloth v. Bustamonte,412 U.S. 218, 248, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Dotson v. Warden,175 Conn. 614, 618, 402 A.2d 790 (1978)." State v. Reagan,209 Conn. 1, 7 (1988). At a suppression hearing, the state must prove by a preponderance of the evidence that the consent from a person in authority was voluntarily given. State v. Ortiz, supra,17 Conn. App. 103. Whether such a person "has given voluntary consent to enter or search his or her premises is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the entry or search. . . . It is to be decided by the trial court on the basis of the evidence before it that it finds credible, along with the reasonable inferences that may be drawn from that evidence. . . . The ultimate question is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." (Citations omitted; internal quotation marks omitted.) State v. Vargas,34 Conn. App. 492, 496-97, cert. denied, 230 Conn. 907 (1994); Statev. Fields, 31 Conn. App. 312, 324-25, cert. denied, 226 Conn. 916
(1993).
Concerning the search of apartment #59, the court finds the following facts. After Jose Rodriguez was taken into custody and brought to the police station by O'Connor and Gugliotti, Ricci and Velez proceeded to the fifth floor of the building at 330 East Main CT Page 6129 Street to apartment #59. After Ricci knocked on the door, they were met by Juana Compres, now known as Juana Lara. She is Spanish speaking, but understands some English. Officer Velez explained to Lara in Spanish that Rodriguez had been arrested for possession of narcotics. Velez further explained to Lara that he and Ricci were police officers and that they were seeking her permission to search the apartment for drugs. Rodriguez lived with Lara in apartment #59, which Lara rented and acknowledged to be hers. Lara responded that she knew that this was going to happen someday and expressed a willingness to be cooperative with the police. Velez explained to Lara that he was waiting for fellow officers to bring a consent to search form for her to sign. Shortly thereafter, O'Connor, Gugliotti and another officer arrived with the form, which was printed in English. Gugliotti prepared the form for Lara's signature, State's Exhibit 24. Velez translated it into Spanish. Lara signed the consent form after indicating to Velez that she understood the completed form. After executing the consent form, Lara directed Ricci to her bedroom closet where she pointed out a cardboard box, State's Exhibit 16. In that box, the police found, among other things, illegal drugs, $1,870 in U.S. currency and a .25 caliber pistol. While searching in the kitchen of the apartment, O'Connor discovered a false floor, underneath which he found more illegal drugs, automatic weapons and ammunition.
During the hearing on this motion, Juana Lara testified. She related that the police on February 7, 1995, entered her apartment without her permission while the door was locked. Then, they informed her that they had arrested the defendant and demanded that she show the police where the drugs were unless she wanted to be arrested and her minor son taken from her. In her court testimony she related she felt threatened by the police and indicated that during the search of the apartment, she signed the consent to search form after police had been searching her apartment for 45 minutes. The court concludes that Ms. Lara is not a credible witness concerning the facts critical to search of apartment #59.
Also testifying at the suppression hearing was Ms. Lara's teenage son, William Compres. William testified that on the night of February 7, 1995, he was in his bedroom in apartment #59 when Officer Velez appeared at his bedroom entrance and pointed his service revolver at him. According to William, Velez also showed him a picture of Rodriguez, whom William identified as his mother's boyfriend. William related that he heard the officers threaten his mother with arrest and the loss of her son if she did not cooperate CT Page 6130 with the police. He further testified that for 35 minutes the police were searching the apartment prior to William's seeing his mother sign the consent to search form, which William stated was brought to the apartment by Sergeant Neil O'Leary. O'Leary testified he was not in the apartment on the night in question and did not that night bring the consent to search form to Lara's apartment. The court concludes William, too, is not a credible witness in any respect critical to the determination by this court of whether Lara consented to the February 7, 1995 search of apartment #59.
The court concludes that Officer Velez' testimony, in part confirmed by Ricci, is credible. Thus, the court finds that Ms. Lara voluntarily consented to the search of her apartment and the subsequent seizures of narcotics were legal. The defendant's motion to suppress the narcotics seizures from apartment #59 is therefore denied.
 IV.
The motion to suppress is granted as to the seizure of drugs from the defendant's person incident to his arrest, and the seizure of drugs from his automobile. The motion, however, is denied with regard to the seizures from apartment #59.
WILLIAM PATRICK MURRAY, J. A Judge of the Superior Court